**CODY FINANCE CO. et al.**

v.

**LEGGETT et al.**

Civ. No. 3383.

United States District Court,
D. Wyoming.

July 13, 1953.

Alfred M. Pence, Laramie, Wyo., for plaintiff Cody Finance Co.

C. R. Ellery, Cheyenne, Wyo. (Ellery, Gray & Hickey), Cheyenne, Wyo., for defendant Reconstruction Finance Corporation.

KENNEDY, District Judge.

This is one of a number of cases which have come before this Court, both civil and criminal, growing out of the complicated business of A. F. Leggett and the Motor Sales Company carried on at Cody, Wyoming, which finally wound up in the bankruptcy court of this District. While the litigants and issues in the case as originally filed were somewhat numerous and complex, through pretrial conferences they were eventually all eliminated except the issue between the Cody Finance Company and the Reconstruction Finance Corporation as to which of these parties had the right to possession and to own or collect certain accounts and notes receivable which were the property of the Motor Sales Company and of which that company had made some sort of disposition at different times to each plaintiff and defendant above mentioned. Reference to the

pleadings would seem to be unnecessary on account of the admissions and stipulations of the parties through their counsel as to the exact question involved.

After the evidence had been submitted it clearly developed that the amount in controversy considering the type of litigation and that counsel for the defendant corporation had agreed to the charges for collection made by the plaintiff company and further considering the substantial losses which had been sustained by both litigants, that a compromise would be the most efficient and inexpensive way of disposing of the case and each party thereby adding something to its already heavy losses. This Court still believes that it would have been the most advantageous manner of disposition. However, plaintiff's counsel seems to feel that on account of other pending or impending litigation involving Leggett and the Motor Sales Company, combined with the fact that some of the principals in the transactions involved might be placed in a compromising position such an effort for compromise could not be entertained. I still think that in line with the general run of cases where money only is involved there is usually a basis for satisfactory adjustment; that it would have been true in the case at bar as the solution of the problem depends largely upon a matter of law and certainly no compromise upon the ground of expediency and for the purpose of saving time and expense would be admissible in any other litigation nor in the absence of any fraud could it compromise any participant in the transaction in not taking all the steps which may have been imposed upon him or them as a matter of legal conclusion. Nevertheless, the parties having failed to accept the counsel of the Court along the line suggested and having elected to contest the matter to the bitter end, counsel may be assured that the Court is here for the purpose of discharging the duty imposed upon it.

Instead of submitting the matter by oral argument it was agreed by the counsel with the approval of the Court, that the most effective way to present it would be in the form of trial briefs, which have been submitted within the time fixed.

A running sketch of the transactions which were the bases of this portion of the litigation are substantially as follows: The Motor Sales Company was a heavy borrower from the First National Bank of Cody, the Cody Finance Company and other kindred organizations which were interrelated to each other by ownership, as well as other creditor banks at various locations in the country. Under these circumstances the idea arose that a loan might be secured from the Reconstruction Finance Corporation, owned and controlled by the United States, to secure a loan which would put the debtor in a better financial position. The first effort along this line was met with failure but through direct appeals to Washington managers of the R. F. C., a loan of $50,000 was secured which presumably was used to pay off other obligations, some of those obligations of the Cody bank having been switched to the plaintiff company or some of its interrelated associates. Some time later an attempt was again made to secure a larger loan which would be used in part to take up obligations of the Motor Sales Company, including a merger of the former loan, the new loan from the R. F. C. having been agreed upon with the assistance of some pressure at Washington in the amount of $94,000. Papers in evidence of the loan were executed, including what is in evidence in this case as "Blanket Assignment of Accounts and Notes Receivable". This appears to have been executed and delivered on the 24th of March, 1950. Briefly, it purports to assign the accounts and notes receivable of the Motor Sales Company to the Reconstruction Finance Corporation as collateral security for a loan in the amount of $94,000, which loan was evidenced by loan agreement and the note and mortgage made the same date and by reference made a part thereof. It was to be considered by the parties as a blanket

assignment of such accounts and notes receivable then held or thereafter acquired while any indebtedness was due and owing from the Motor Sales Company. It was provided that in the event of default in the payment of the loan, or any installment thereof, or the failure of the assignee to fulfill any of the other conditions of said loan as more particularly set forth in the note, mortgages, and supporting documents, then in that event the notes and accounts should immediately become the property of the R. F. C., for the purpose of applying the proceeds of the collection thereof upon the indebtedness. It was provided that the First National Bank of Cody be appointed by the Motor Sales Company as its agent and custodian for the purpose of carrying out the provisions of the instrument for the protection of the R. F. C. The First National Bank of Cody acceded to the arrangement and accepted the duty imposed by which it was required to examine the accounts and notes receivable of the Motor Sales Company at will and without expense to the R. F. C., and to report thereon to the R. F. C., and upon request the bank was to furnish an itemized schedule of names and addresses of each of the debtors covered by this instrument. It further provided that the Motor Sales Company agreed to maintain the accounts and notes receivable in the amount of $30,000 with right of substitution and should the accounts and notes receivable fall below $30,000 at any time, then the Motor Sales Company agreed to deposit with said bank in trust for the use and benefit of the R. F. C., an amount which, together with the notes and accounts receivable, would equal at least $30,000 and that on account of the non-fulfillment of the terms by Motor Sales Company in regard to maintaining said accounts and notes receivable and cash in the sum of $30,000, the same would constitute a default in the terms of the $94,000 loan, by which such default the entire balance due on the indebtedness would be accelerated and that the bank upon notification by

the R. F. C. would hold and maintain the cash and such accounts and notes as might be on deposit with said bank, for the use and benefit of the R. F. C. Another section provided that in the default in the payment of the loan the bank was authorized by the Motor Sales Company to obtain immediately the name and address of each of the debtors from the accounts and notes receivable and the amounts due thereon, and that either the bank or the R. F. C., or both, should immediately notify each and all said debtors to make payment direct to the bank, there to be held in trust by said bank for the use and benefit of the R. F. C., and that said bank should remit the funds so deposited upon request of the R. F. C., which upon receipt would be credited against the indebtedness of the Motor Sales Company to the R. F. C. I gather from the evidence that in addition to the R. F. C., the Cody Bank and the Motor Sales Company were supposed to have copies of this agreement although it was never recorded or filed in the office of the County Clerk.

On October 25, 1950, for the purpose of securing additional loans there was executed what is denominated as an "Assignment agreement, chattel mortgage and real estate mortgage" to the Cody Finance Company in which it purported to sell, assign and transfer to said company all notes receivable and accounts receivable and all money then due or becoming due to the Motor Sales Company in connection with their automobile business, with authority to the Finance Company to have and to hold and collect the same and that the funds so collected and received should be the property of the Finance Company and should not be credited or deposited to the account of the Motor Sales Company but should be credited and deposited to the account of the Finance Company. Included in this instrument is what purports to be a mortgage or transfer of certain personal property and real estate. This instrument was subsequently filed and recorded in the office of the County Clerk of Park County. It was

inspired by the situation that the Motor Sales Company needed additional money to keep its business going and in order to secure the same from the Finance Company additional instruments of security were required. These included the accounts and notes receivable. While this agreement was placed of record the accounts and notes receivable were left in the hands of the Motor Sales Company to be handled in the usual custom of collecting and adding to until on or about November 9th, when the general manager of the Cody Finance Company becoming alarmed at the embarrassing financial situation of the Motor Sales Company went to the office of the latter company and removed said accounts and notes receivable and took them to its own office where they were subsequently retained except with an occasion of taking them back to the Motor Sales office for additions or corrections and again placing them in the office of the Cody Finance Company. In this respect the mortgage or lien of plaintiff was in the same situation as plaintiff's instrument in that for a period of about two weeks the accounts and notes were left in the control of Motor Sales, the assignor. In substance these are the two instruments around which revolves the divergent contentions in regard to the priority in right of possession, ownership and authority to collect same.

Pursuing what seem to be pertinent facts further it appears that at the time the transactions involved here occurred E. J. Goppert was at one time President and later Chairman of the Board of the First National Bank of Cody, with which bank the instrument between the R. F. C., and the bank was lodged as agent for the purposes hereinbefore stated, and at the same time he was the General Manager of the Cody Finance Company, plaintiff, a copartnership, although not himself a partner in said organization. Jerry Housel, a practicing attorney at Cody and one-time partner with Goppert, was the Assistant Manager of the Cody Finance Company, handled many of their transactions and generally acted

as manager in the absence of Goppert. At the same time he was attorney for the Motor Sales Company. During the latter part of October 1950 Goppert was on a visit in Kansas when the urgent appeal was made by the Motor Sales for loans, first, of $17,500, and, second, $12,500, said second loan to be for a brief temporary period in the matter of permitting the Motor Sales to release and secure possession of some automobiles. A telephonic communication was had between Leggett of the Motor Sales Company, Housel, and some others interested in the transaction with Goppert at his then location in Kansas about granting the requested loan. Goppert and Housel both testified to the effect that Goppert was averse to making an additional loan unless there could be furnished some additional security and that when the matter of accounts and notes receivable was mentioned Leggett assured him that they were not covered by any previous security. Nevertheless, Goppert instructed Housel to make inquiry by searching the records and such additional inquiries as would seem necessary to ascertain whether or not such accounts and notes were covered. Housel testified that he had been previously informed by Leggett of the Motor Sales Company that in a conversation with Leggett he had first stated that he thought perhaps they were included in the instrument given to the R. F. C., but then changed his statement by saying that they were first talked about and then the R. F. C., decided to take other security in the nature of Stock Addition property. In addition Housel searched the county records and found no evidences of the instrument which is the basis of the defendant's relief here sought. He also inquired at the First National Bank and the officer in charge there advised him that he found nothing in the bank records indicating that the so-called assignment was among the records of the bank. As I remember the testimony, which has not been transcribed, I think Housel made an examination of the appropriate records of the Motor Sales

Company as its attorney to ascertain whether or not there was any record of the so-called instrument there on file and found none. Goppert testified that he knew nothing about the so-called Trust Agreement between the Motor Sales and the R. F. C., until it came to light a considerable time after he had taken possession of the accounts and notes receivable of the Motor Sales. Housel upon questioning testified that he did not inquire of Frank B. O'Mahoney, formerly attorney for the Motor Sales, who participated in securing the additional loan from the R. F. C., nor did he inquire of the R. F. C., in regard to any former pledge of the accounts and notes receivable. O'Mahoney, however, testified on the trial that he had nothing to do with the closing of the loan or the preparation of papers thereon.

■■ Counsel for plaintiff has filed a voluminous brief, a large portion of which is taken up with argument and authorities relating to the legal nature of the R. F. C., document in attempting to show principally "what it is not" in the way of a legal instrument. Voluminous authorities are cited in support of his various contentions. It is discussed as an assignment, an equitable assignment, a chattel mortgage, and the possibility of its being within the scope of the Uniform Trust Receipts Act, an executory contract to assign, and an assignment of future accounts receivable. Counsel is to be accredited with great energy and a pronounced degree of acumen in his effort to properly advise the Court. However, from an examination of the numerous cases cited by both sides I have arrived at the view that this so-called instrument of assignment can be properly classified as an "equitable lien" upon said accounts and notes receivable and as such is absolutely valid and enforceable as between the assignor and the assignee. As a corollary to this proposition it would be likewise valid and enforceable against any interested parties who took the items there covered with knowledge or notice of its existence at the time. Under these circumstances it seems to me that the matter of there being no default in the obligations of the assignor, Motor Sales Company, at the time the seizure was made by the plaintiff company can have little effect on the rights of an assignee subsequent to the R. F. C., who took his assignment either with knowledge or notice of the former assignment or conditions under which he was required to make such search and inquiry as would reasonably have put him on notice of the existence of the prior instrument. In fact such is the contention of counsel for defendant, which narrows the deciding issue in this case down to the point as to whether or not under all the circumstances the plaintiff company through its officers had actual or constructive notice of the instrument of security held by defendant R. F. C., or if this is not shown whether the plaintiff company through its officers made such investigation and inquiry as the law would require them to do in ascertaining whether or not there was in existence any previous instrument which purported to pledge these accounts and notes receivable. This theory of law is supported by authorities from a number of jurisdictions which will not be cited to prolong the length of this memorandum except that in the case of McGann v. Capital Savings Bank & Trust Co., 117 Vt. 179, 89 A.2d 123, 126, a Vermont case, it is said:

"It is a rule of general application that one who has knowledge of facts sufficient to induce a prudent man to inquire in respect to other facts germane to the matter in hand, will be charged with knowledge of such other and further facts as he might have learned by reasonable diligence in prosecuting his inquiry in the right direction. * * *"

In my view the matter of whether the questions arose under the same circumstances and conditions in the cases cited is of no serious moment, because the principle should be adopted wherever it logically applies.

As to whether or not Cody Finance had knowledge of the R. F. C., instrument or whether or not it had sufficient information to put it upon inquiry or whether or not under the circumstances it did make such an inquiry in good faith as would constitute a prudent, diligent and reasonably effective inquiry as would relieve plaintiff from the burden thus cast upon it, is the question.

There are sufficient circumstances in the case to cast a suspicion upon the transactions involved, as for example, that the general manager of the Finance Company, Goppert, testified that he had no knowledge of the instrument although at the same time he was Chairman of the Board of the First National Bank of Cody, which under the agreement was acting as the agent for the R. F. C., in supervising the accounts and notes receivable. Counsel for defendant, however, does not argue this point in his brief but relies principally upon the contention that the officers of the plaintiff company did not make the prudent and reasonable efficient inquiry which would have produced the evidence of the R. F. C., agreement. There is no direct proof of knowledge which can be characterized as evidence supporting that theory. Neither is there direct evidence relied upon here that the plaintiff company had what might be considered as constructive notice of the existence of the R. F. C., instrument. This leaves for consideration the question of whether or not the officials of the plaintiff company did under the circumstances exercise a reasonably prudent, careful and efficient inquiry as to the existence of this previously executed instrument.

As to what inquiry must be made to satisfy the requirement of the law in this respect must be determined from the circumstances in each individual case. In the case at bar it develops that a certain amount of inquiry was indulged by the witness Housel in that he had been told by Leggett that these accounts and notes receivable had not been previously assigned which, at that time Housel, having confidence in Leggett of the Motor Sales Company, believed to be the truth; that he at least searched the county records and made inquiries at the First National Bank resulting in no ascertained fact which would justify in his mind a conclusion that the accounts and notes had been previously assigned. Counsel for the defendant complain he should have inquired further under the circumstances of O'Mahoney, a former attorney for the Motor Sales Company in the transaction, and that he should have made a contact with the R. F. C., itself or the Cody attorneys for the R. F. C., Littleton and Steadman, then representing the R. F. C., in Cody, and perhaps other methods of inquiry which should have been made to bring the case within the rule of prudent and efficient inquiry. The doctrine here invoked is to be applied with caution on account of the peculiarity of the elements of which it is made up. This is illustrated in the language of Judge Reeves of the Federal District Court of Missouri in Federal Savings & Loan Insurance Corporation v. First National Bank, Liberty, Mo., D.C., 67 F.Supp. 207, at page 210, where he says:

"Moreover, the doctrine of presumptive or imputed notice is a harsh doctrine and is only resorted to out of necessity and then with reluctance. Generally its application results from bad faith, fraud or gross negligence on the part of the one charged, and only then invoked because it would be unconscionable to permit the defendant to assert that he had no knowledge." (Citing cases.)

Under the circumstances I can not feel that the proofs in the case at bar bring the matter within the scope of the diligent inquiry rule. In addition the defendant seems not entirely free from neglect or blame, first, in executing an instrument which left the assigned accounts in the hands of the assignor to use as it pleased, and, second, in failing under the circumstances to give adequate supervision and attention to a loan which

seemed undoubtedly to be a hazardous one in the first instance.

For the reasons and upon the grounds stated the finding will be for the plaintiff, awarding it the possession, ownership and right to collect and apply to its own indebtedness the proceeds of the accounts and notes receivable.

Findings of fact and conclusions of law may be formulated by counsel for plaintiff in collaboration with counsel for defendant, together with an appropriate judgment in harmony with the foregoing memorandum to be submitted on or before July 30, 1953, and the clerk will enter an order accordingly. Counsel may by stipulation waive formal findings of fact and conclusions of law and accept the memorandum of the Court in lieu thereof and append thereto such exceptions to findings and conclusions as they may specifically enumerate. The latter method is purely a suggestion on the part of the Court and is not to be adhered to unless it is agreeable to counsel on both sides. It is made simply to save counsel time and effort in the event they feel that their rights are thereby properly protected.