SODA FLAT COMPANY, a California corporation, Plaintiff,

v.

Donald HODEL, United States Secretary of the Interior, Robert Burford, Director of the Bureau of Land Management, Edward Hastey, State Director California Office of the Bureau of Land Management; and the United States of America, Defendants.

No. CV F–85–588 EDP.

United States District Court, E.D. California.

Aug. 5, 1987.

Findings of Facts and Conclusions of Law Sept. 9, 1987.

James R. Parker, Kuhs & Parker, Bakersfield, Cal., for plaintiff.

Sandra K. Dunn, Trial Atty., Dept. of Justice, Land and Natural Resources Div., Sacramento, Cal., for defendants.

## AMENDED MEMORANDUM DECISION ON CROSS MOTIONS FOR SUMMARY JUDGMENT

PRICE, District Judge.

Plaintiff filed its Complaint for a review of an administrative decision and to quiet title. After extensive discovery, the parties filed cross motions for summary judgment.

## FACTS

In preparation for the hearing on the cross motions for summary judgment, the parties stipulated as follows:

That the following facts are true and the following documents genuine for the purposes of this action and this action alone: The real property which is the subject matter of this action is an 80–acre parcel of real property in Tulare County, California, more particularly described as the South Half of the Southeast Quarter of Section 36, Township 19 South, Range 33 East, M.D.B & M., Tulare County, California, according to the official plat thereof (hereinafter the "Real Property"). The Real Property, and all of Section 36 of which the Real Property is a part, was granted by the United States to the State of California as "school lands" under the Act of March 3, 1953 (10 Stat. 244) upon approval of the official plat of such township by the Surveyor General on June 28, 1883.

By Patent dated October 2, 1900 and recorded on October 12, 1900 in Volume U of Patents, Page 141, Tulare County Official Records (Exhibit 1), the State of California granted the Real Property to one C.E. Glover.

On December 1, 1900, C.E. Glover, pursuant to the Act of June 4, 1897 (30 Stat. 36) and the Rules and Regulations promulgated by the Secretary of Interior (24 L.D. 589, 592–593 (1897) (Exhibit 2)), filed with the Registrar and Receiver, United States Land Office, Redding, California, Lieu Selection Application No. 3516, consisting of the Application (Exhibit 3), the Affidavit of John McKea that the land selected was nonmineral and agricultural in character (Exhibit 4), an abstract of title to the Real Property duly certified by the Tulare County Recorder, and a Relinquishment Deed to the Real Property in favor of the United States dated October 8, 1900 (Exhibit 5), which Glover had previously recorded on October 12, 1900 in Book 100 of Deeds, Page 395 of Tulare County Official Records, as required by the Secretary of Interior's Regulations (Exhibit 2).

Pursuant to the Regulations (Exhibit 2), the Registrar and Receiver at the Redding Office forwarded Glover's application to the Commissioner of the General Land Office in Washington D.C. for consideration. On January 2, 1902, the application was examined, the lands selected were found free from conflict and proper, except as to mineral status and publication, and the file was referred to Division "N". On January 6, 1902, Lieu Selection No. 3516 was examined, found free from mineral or other conflicts, and referred to Division P. On June 17, 1911, the Commissioner issued charges against Lieu Selection No. 3516, alleging that the application for the state patent to the Real Property was fraudulently made.

By decision dated November 10, 1915 (Exhibit 6), the Commissioner of the General Land Office rejected Lieu Selection Application No. 3516, refused to accept the Relinquishment Deed to the Real Property tendered by Glover, and cancelled Application No. 3516, on the grounds that, "the selector has no title to the lands offered as base for this selection ..." W.S. Kingsbury, Surveyor General of the State of California, had received on August 2, 1911 a copy of the charges filed against Lieu Selection No. 3516 dated June 17, 1911. The State of California has never commenced any action or proceeding to set aside the Patent dated October 2, 1900 to C.E. Glover (Exhibit 1) or quiet title to the Real Property.

When requested, the Commissioner of the General Land Office, after rejecting a lieu selection application, issued a disclaimer to the base land, intending that such disclaimer be recorded in the local land records of the county in which the base land was located for the purpose of clearing any cloud upon title created by the prior recording of the relinquishment deed. The Commissioner of the General Land Office, when requested, also returned the relinquishment deed and abstract of title to the applicant. Examples of disclaimer letters and letters returning relinquishment deeds and abstracts are included in the file as Exhibits 11–1 through 11–18 and 11–19 through 11–33, respectively.

By Indenture dated July 11, 1919 and recorded on October 15, 1919 in Volume 278 of Deeds, Page 254, Tulare County Official Records (Exhibit 7), C.E. Glover conveyed the Real Property to The McCloud River Lumber Company. By letters dated February 7, 1919 (Exhibit 8) and May 2, 1919 (Exhibit 9), The McCloud River Lumber Company, through its attorneys, Marshall & Glavis, requested the Commissioner of the General Land Office to furnish them with a disclaimer by the Government to the Real Property. By letter dated May 10, 1919 (Exhibit 10), Clay Tallman, the Commissioner of the General Land Office, advised Marshall & Glavis, as attorneys for the McCloud River Lumber Company, that Selection No. 3516 had been cancelled on November 10, 1915, "... the United States by such cancellation refused to accept title to said base lands and does not now claim any right, title or interest to the said lands above described." On July 15, 1919, the abstract of title submitted by Glover was returned to B.W. Marshall, "... as attorney for C.E. Glover and The McCloud Lumber Co."

The Commissioner's disclaimer letter dated May 10, 1919 covering the Real Property was recorded on October 15, 1919 in Volume 11 of Miscellaneous Records, Page 483, Tulare County Official Records (Exhibit 12) in connection with the sale of the Real Property by The McCloud River Lumber Company to Eugene L. Scott by Indenture dated August 2, 1919, also recorded on October 15, 1919 in Volume 278 of Deeds, Page 255, Tulare County Official Records (Exhibit 13).

Eugene L. Scott constructed a one-room log cabin on the Real Property and fenced a substantial part thereof. The Real Property, its cabin and fenced pasturage became known as "Scott's Camp". Annual real property taxes have been assessed upon the Real Property and its improvements by the County of Tulare and have been paid each year since at least 1919.

The chain of conveyances of the Real Property from Eugene L. Scott to the plaintiff Soda Flat Company consists of the following described instruments, copies of which are included in the file as the following designated Exhibits:

| Description of Document | Exhibit |
|---|---|
| (a) Indenture dated February 12, 1923 from Eugene L. Scott to Robert Horbach, recorded on February 26, 1923 in Volume 10, Page 60 Tulare County Official Records. | 14 |
| (b) Indenture dated May 1, 1923 from Robert Horbach in favor of Eugene L. Scott, recorded on April 10, 1924 in Volume 62, Page 237, Tulare County Official Records. | 15 |
| (c) Indenture dated May 1, 1923 from Eugene L. Scott and Dora Scott, his wife, to J.W. Hewey, recorded on April 10, 1924 in Volume 62, Page 238, Tulare County Official Records. | 16 |
| (d) Decree of Final Distribution in the Matter of the Estate of J.W. Hewey, Tulare County Superior Court Probate No. 6475, dated June 10, 1935, in favor of his widow Anna L. Hewey, recorded on June 10, 1935 in Volume 630, Page 216, Tulare County Official Records. | 17 |
| (e) Deed dated July 14, 1943 from Anna L. Hewey to Ralph L. Smith, Jr. and Edna M. Smith, his wife, Frank Digier and Alberta Digier, his wife, and Lloyd Ralphs and Edna Ralphs, his wife, recorded on August 7, 1943 in Volume 1040, Page 288, Tulare County Official Records. | 18 |
| (f) Grant Deed dated February 19, 1968 from Ralph L. Smith, Jr., Edna M. Smith, Frank Digier, Alberta Digier, Lloyd Ralphs and Edna Ralphs in favor of Soda Flat Company, a California corporation, recorded on March 4, 1968 in Volume 2767, Page 57, Tulare County Official Records. | 19 |

The Smiths, Digiers and Ralphs paid Anna Hewey $4,500 for the Real Property in 1943 and received a policy of title insurance in such amount from Title Insurance

and Trust Company (Exhibit 20). The Smiths, Digiers and Ralphs at the time they acquired the Real Property had no knowledge of the charges made by the Commissioner against Lieu Selection No. 3516 in 1911. On October 31, 1967, Ralph and Edna Smith, Frank and Alberta Digier and Lloyd and Edna Ralphs incorporated Soda Flat Company, which remains a California corporation in good standing, and conveyed the Real Property to it in February 1968. The Smiths, Digiers and Ralphs from 1943 through 1967 paid real property taxes assessed upon the Real Property, its cabin and other improvements by the County of Tulare; Soda Flat Company has paid real property taxes assessed on the Real Property, its cabin and other improvements from 1968 through the current year. The Smiths, Ralphs and Digiers, and their families have used, occupied, maintained and improved the Real Property, its cabin, fences and other improvements from 1943 to the present. Photographs of the cabin, cookshed, bathhouse and other improvements are included in the file as Exhibit 21. Soda Flat Company and the County of Tulare by Land Conservation Contract dated January 16, 1973 (Exhibit 22) placed the Real Property into the agricultural preserve pursuant to the Williamson Act. Ralph and Edna Smith and Frank and Alberta Digier are now deceased, but the stock of Soda Flat Company remains held by their children and by Lloyd and Edna Ralphs.

When Glover filed Lieu Selection Application No. 3516 in 1900, the Real Property was surrounded by the Sierra Forest Preserve, later organized into the Inyo and Sequoia National Forests. Although technically within the exterior boundaries of the Inyo National Forest, the immediate area around the Real Property was administered by the Sequoia National Forest from 1968 through 1980. The Real Property was shown as private property, not National Forest lands, on the following official maps of the United States Forest Service, which maps were published for and made available to the general public:

(a) Inyo National Forest—South Half California and Nevada Mt. Diablo Meridian 1949

(b) Inyo National Forest—South Half California and Nevada Mt. Diablo Meridian 1964

(c) Map Showing Motor Vehicle Control Area Sequoia & Inyo National Forest U.S. Department of Agriculture Forest Service 1975

(d) U.S. Department of Agriculture Forest Service R. Max Peterson, Chief Sequoia & Inyo National Forest Mt. Diablo Meridian 1978

As of June 3, 1971, the land records of the Sequoia National Forest, which administered Inyo National Forest lands south of the Kern Ridge-Toowa Range from the Kern River to Olancha Peak, including the area around the Real Property, indicated that the Real Property was in private ownership, not Forest Service lands. The Real Property was shown as National Forest Lands, not private property, on the following official maps of the United States Forest Service, which maps were published for and made available to the general public:

(a) Inyo National Forest—South Half California and Nevada Mt. Diablo Meridian 1972

(b) U.S. Department of Agriculture Forest Service John R. McGuire, Chief Forest Visitor Map Inyo National Forest—Califonria 1979

(c) U.S. Department of Agriculure Forest Service R. Max Peterson, Chief Sequoia National Forest—California 1983

The United States has maintained for general public use Forest Service Trail No. 34E19 from the Kern River to Jordan Hot Springs which crosses through the Real Property. Except for this trail, the United States has never physically occupied, possessed or improved the Real Property.

By letter dated September 17, 1976, addressed and mailed to Ralph L. Smith (Exhibit 23), John A. Leasure, Sequoia National Forest Supervisor, asserted that the Real Property was "Federal lands." Mr. Leasure wrote, in part as follows:

It was conveyed to the United States of America by C.E. Glover under the Act of June 4, 1897 ... C.E. Glover did not subsequently receive either a lieu selection or a reconveyance under either the said Act of June 4, 1897, the Act of September 22, 1922 ..., or the Act of April 28, 1930.... A claim to the land was not registered with the Department of Interior under the Script Recordation Act of August 5, 1955 ..., during the two year period provided for registration. The Act of July 6, 1960 ..., confirmed title to the United States. The person claiming at that time failed to file claim for reimbursement under provisions of the 1960 Act within the one year allowed."

Except for a telephone conversation between the Forest Service's Bob Hull and Ralph Smith referred to in Mr. Leasure's letter dated September 17, 1976, which occurred a few days before the date of the letter, neither the United States Forest Service nor any other federal agency had ever notified Soda Flat Company, or its predecessors, either in writing or orally, of the asserted claim of the United States Government to the Real Property. Previous correspondence between Soda Flat Company and the United States Government was limited to a Forest Service form letter dated April 14, 1970 (Exhibit 24) inquiring as to the details of Soda Flat Company's acquisition of the Real Property from the Smiths, Digiers and Ralphs in 1968, Ralph L. Smith's reply thereto dated April 15, 1970 (Exhibit 25), and various annual fire inspection forms left at the cabin on the Real Property each year by Fire Prevention Technicians. (Exhibit 26).

In reply to Mr. Leasure's letter, Ralph L. Smith, Jr. advised the Forest Service by letter dated September 30, 1976 (Exhibit 27), in part as follows:

My wife and I, together with four other persons, acquired this property in August of 1943 and occupied and paid taxes on such property until it was conveyed to Soda Flat Company in 1968. Since 1968, Soda Flat Company, 100% owned by the original six persons, has occupied and paid the taxes on such property. Insofar as we are aware, the United States has no valid claim to the property, and the Forest Service has no basis for attempting to administer such property as part of the Sequoia National Forest.

I have asked Title Insurance and Trust Company to research this claim and explain to me how they gave me a title policy in 1943.

We have long enjoyed an amicable relationship with the Forest Service, and we wish to do so in the future. Nevertheless, we cannot acquiesce to your assertion that our property is Federal lands.

On or about March 16, 1977, Soda Flat Company filed an application (Exhibit 28) with the California State Office of the Bureau of Land Management ("BLM") for a Document of Disclaimer pursuant to Section 315 of the Federal Land Policy and Management Act of 1976 (90 Stat. 2744; 43 U.S.C., § 1745).

On February 24, 1978, the President signed the Endangered American Wilderness Act of 1978 (92 Stat. 40) which designated about 306,000 acres in the Inyo and Sequoia National Forests as the "Golden Trout Wilderness Area" to be administered, subject to valid existing rights, pursuant to the Wilderness Act (78 Stat. 890; 16 U.S.C., § 1131). The Real Property is within the exterior boundaries of the Golden Trout Wilderness Area.

By letter dated July 23, 1981 (Exhibit 29), the California State Office of the BLM advised the Forest Service of Soda Flat Company's filing of an application for a recordable disclaimer and stated additionally:

Submitted with the application was a copy of a letter dated May 10, 1919, from the Commissioner of the General Land Office which states in part as follows:

'... In reply you are advised that as the selection was canceled November 10, 1915, the United States by such cancellation refused to accept title to said base lands. (S½SE¼ Sec. 36, T. 19 S., R. 33 E., MDM.,) and does not now claim any right, title or interest to the said lands above described.'

Since the Department of Interior has disclaimed any interest in the above-described land, we propose to record the November 10, 1915 letter, thereby clearing the title to the same. Before taking such action, we would appreciate any comments you have to our recommended action.

The Forest Service's reply dated December 28, 1981 (Exhibit 30) urged BLM not to record the Commissioner's disclaimer (Exhibit 10):

We strongly recommend that the November 10, 1915 [sic May 10, 1919], letter *not* be recorded. Since letter disclaimers were not authorized prior to September 22, 1922, and are not considered reconveyances 'as provided by law,' the instrument would not divest the United States of any interest in the land. However, recordation of the disclaimer would impart constructive notice of its existence and the United States could conceivably be estopped from asserting title to the land.

By Instruction Memorandum dated November 18, 1982 (Exhibit 31), the Acting Associate Director of the BLM instructed all State Directors to deny all pending applications for recordable disclaimers to "former lieu selection base lands within the National Forests".

By letter dated September 30, 1982 (Exhibit 32), Soda Flat Company requested BLM to consider its application to be also filed pursuant to the authority of Section 6 of the Act of April 28, 1930 (46 Stat. 857; 43 U.S.C., § 872). By Decision dated December 7, 1982 (Exhibit 33), the California State Office of the Bureau of Land Management rejected Soda Flat Company's application. Soda Flat Company timely filed a Notice of Appeal (Exhibit 34) of the California State Office's Decision to the Interior Board of Land Appeals and a Statement of Reasons and Request for Hearing (Exhibit 35). By Decision dated September 2, 1983 (Exhibit 36), the Interior Board of Land Appeals upheld the decision of BLM's California State Office. The instant case was commenced in this court on October 24, 1985.

All Exhibits referred to are incorporated herein by reference. The joint Exhibits which are numbered one (1) through twenty-five (25) are not reproduced here but are part of the record of the action and are contained in the file. Based on the stipulation of the parties and the Court's reading of the documents, the Court finds as facts in this action each of the facts stipulated to.

The Court's decision will ultimately turn on the effect of the following facts:

Exhibit "6" which is a copy of a letter dated November 10, 1915 stated in pertinent part:

Independent of that, however, upon a consideration of the testimony as reviewed in this decision of this date, in Miot [sic] No. 010208, which is made the leading decision, a copy of which is herewith inclosed, [sic] this office is convinced that the Government proved its charges of fraud in the acquisition of the base land. From this, it follows that the selector has no title to the lands offered as base for this selection, nor can this conclusion be affected by reason of any interest which the McCloud River Lumber Company, transferee, may have acquired in the selected land, for a transferes of lands selected can acquire no better right than the selector. (Hiram M. Hamilton, 39 L.D. 607.)

Accordingly, the recommendation of your office is concurred in, and lieu selection No. 3516 is hereby rejected and the case closed. So note on your records and advise the parties of this decision.

The government does not dispute the authority of its agents to write such a letter. Indeed, the entire exchange program contemplated that certain of the relinquishments to the United States would be rejected for one reason or another. The original act under which the relinquishments to the government were tendered, contained a fatal flaw. The regulations issued by the General Land Office of the Department of the Interior provided in paragraph 16:

Where final certificate or patent has issued, it would be necessary for the entryman or owner thereunder to exe-

cute a quick claim deed to the United States *have the same recorded on the county records, and furnish an abstract of title, duly authenticated, showing chain of title from the government back again to the United States.*

The recording of this deed in California created problems that apparently the Congress did not envision when the various exchange acts were passed. Section 1056 of the California Civil Code which was incorporated into the Code at the time of its origin in 1872 and has remained unchanged since then, provides as follows:

A grant cannot be delivered to the grantee conditionally. Delivery to him, or to his agent as such, is necessarily absolute, and the instrument takes effect thereupon, discharged of any condition on which the delivery was made.

Section 1058 of the California Civil Code also placed in the original version and remaining unchanged provides as follows:

Redelivering a grant of real property to the grantor, or cancelling it, does not operate to retransfer the title.

The early California decisions sustain the qualification of a prohibition against conditional deliveries. In *Albert v. Albert*, 12 Cal.App. 268, 107 P. 156 (Second Appellate District 1909) the court stated:

Query, whether acknowledgement requisite as between the parties), it would seem that the rule established by section 1056; Civil Code, with reference to the delivery of grants, is equally applicable to transfers by deed or assignment of certificate of purchase. That section provides that a grant cannot be delivered to the grantee conditionally. Mr. Jones, in his Law of real property, section 1303, says: 'If the delivery be to the party to who it is made, though upon the express condition, not appearing upon the face of the deed, that it is to take effect only upon certain conditions, whatever may be the form of the words, the delivery is absolute, and the deed takes effect immediately." To the same effect is Devlin on Deeds, section 314, and *Mowry & Heney*, 86 Cal. 471, [25 Pac. 17],

*Albert, supra,* 12 Cal.App. at 271, 272, 107 P.156.

In *McGorray v. Robinson*, 135 Cal. 312, 67 P. 279 (1902), the Court observed:

Plaintiff introduced and read in evidence the record of a deed dated December 29, 1891, made by Stephen W. McGorray to plaintiff, describing the lands as described in the complaint, which deed was signed, acknowledged, and recorded the day of its date. No objection was made to the deed or the record thereof being read in evidence. It was admissible in evidence. (Code Civ. Proc., sec. 1951.) It carried with it the presumption that it was delivered on the day of its date. (Civ.Code, sec. 1055; *Gordon v. City of San Diego*, 108 Cal. 268 [41 P. 301]; *Ward v. Dougherty*, 75 Cal. 243 [17 P. 193].)

*McGorray, supra,* 135 Cal. at 314, 67 P. 279.

Clearly then, the conveyance to the United States, which was recorded, created a prima facie title in the United States. The agents and employees of the United States came upon evidence which led them to believe that the title vested in the United States was defective and, hence, in accordance with the directions of the statutes and the mandates of Congress, they determined not to accept the proffered grant of the property.

This procedure, of course, was taken pursuant to valid public policy. The government did not want to transfer lands over which they had perfect title in exchange for a clouded, or imperfect title.

The 1897 Act provided no specific procedure for reconveying the land if an application was incomplete, inadequate or was simply rejected by the Government. The Land Office, however, instituted a practice of issuing letters of disclaimer so that landowners whose applications were rejected could clear whatever cloud was created on their title by virtue of the execution and/or recordation of the quitclaim deed given to the Government.

In Exhibit "11", there are approximately thirty-four (34) letters written by officials of the General Land Office, Department of

the Interior, between 1899 and 1920, refusing to accept or returning as rejected deeds tendered for in lieu selection of government lands.

In the instant case, on May 10, 1919, in reply to a letter addressed to the General Land Office of the Department of Interior, Clay Tallman, Commissioner, wrote as follows:

This office is in receipt of your letter of May 2, 1919 requesting a disclaimer covering the S½ of SE¼ Sec. 36 T. 19 R. 32 E.M.D.M., formerly the basis for Forest Selection No. 3516 now Sacramento 05424 made by C.E. Glover, December 3, 1900.

In reply you are advised that the selection was cancelled November 10, 1915. The United States by such cancellation refused to accept title to said base lands and does not now claim any right, title or interest to the lands above described.

This was recorded on October 15, 1919 in the Tulare County Records.

Finally addressing the problem, then Acting Secretary of the Interior described this policy in a May 26, 1921 letter to U.S. Representative N.J. Sinnott:

In order to relieve the situation as far as it was possible in the absence of statute, the General Land Office has in a number of cases entered upon its records renunciations of title and declarations of pertinent facts and furnished copies to be spread upon the deed records; but the effect of such a document, even where so recorded, has been frequently questioned.

(Exhibit 26)

In responding to a request for statutory authority for what was already an approved administrative practice, Congress provided in the 1922 Act, "[w]here an exchange can not be agreed upon the Commissioner of the General Land Office is hereby authorized to relinquish and quitclaim to such person or persons, their heirs or assigns, all title to such lands which the respective relinquishments of such person or persons may have vested in the United States." 1922 Act. (Exhibit 27)

As shown by the stipulated set of facts, all parties subsequent to the recording of the government's letter of May 1919, have treated the land as being privately owned. Thereafter, the fee title has been transferred by a series of grantors until it finally vested in the plaintiff here. As a result of these transactions, the title insurance company issued a policy of title insurance on August 7, 1943. A policy of title insurance contains the following exceptions:

6. Any title or claim of interest to the United States of America, the State of California, or claimants thereunder, upon the charge that said land was known to be mineral in character on the date the survey thereof by the surveyor general was approved.

As detailed in the stipulated set of facts, starting in 1949 a series of maps issued by the agencies of the United States showed the property in question to be under private ownership. It is further agreed by the parties that the United States has maintained for general public use Forest Service trail No. 34E19 from the Kern River to Jordan Hot Springs which crosses the real property. Except for this trail, the United States has never physically occupied, possessed or claimed any interest in the real property until the controversy which led to this litigation arose.

On July 6, 1960, Congress passed the Sisk Act, Public Law 86–596, 74 Stat. 334 (1960). The announced purpose of the Sisk Act was to clear up titles to land which had been tendered to the United States, but exchange had never completed. The Act contained a one year statute of limitations by which to file claims. Besides providing for a very short period for owners of relinquished or conveyed lands to claim the statutory sum of $1.25 per acre, the Act in effect conveyed such lands to the United States.

It is clear that the action which gave rise to the government's interest in the land was the Glover deed and the offer of relinquishment tendered to the government in 1900. Apparently, the matter laid dormant until 1915 when the government determined that Glover's title was deficient.

This position was reiterated by the government in 1919 and the letter reiterating that position was ultimately recorded. The history of the government's renewed claim to the land arose recently.

In 1976, John A. Leasure, Forest Supervisor of the Sequoia National Forest wrote to the plaintiff in pertinent part as follows:

The land in question is Federal lands. It was conveyed to the United States of America by C.E. Glover under the Act of June 4, 1897 (30 Stat. 36), by deed recorded October 12, 1900, in Tulare County. C.E. Glover did not subsequently receive either a lieu selection or a reconveyance under either the said Acts of June 4, 1897, the Act of September 22, 1922 (42 Stat. 1017), or the Act of April 28, 1930 (46 Stat. 256, 357). A claim to the land was not registered with the Department of Interior under the Script Recordation Act of August 5, 1955 (69 Stat. 534), during the two year period provided for registration. The Act of July 6, 1960 (74 Stat. 334), confirmed title to the United States. The person claiming at that time failed to file claim for reimbursement under provisions of the 1960 Act within the one year allowed.

The land has been administered as a part of the Sequoia National Forest, (originally Tulare Forest Reserve) since the deed to the United States by C.E. Glover in 1900. We will continue administering these lands for National Forest purposes.

The last paragraph of that letter, namely "the land has been administered as part of the Sequoia National Forest since 1900" is at variance with the following facts which were stipulated to:

As of June 3, 1971, the land records of the Sequoia National Forest, which administered Inyo National Forest lands south of the Kern Ridge-Toowa Range from the Kern River to Olancha Peak, including the area around the Real Property, indicated that the Real Property was in private ownership, not Forest Service lands.

*See Stipulated Facts, supra,* p. 8, lns. 6 through 10.

The parties further stipulated with regard to the Leasure letter as follows:

Except for a telephone conversation between the Forest Service's Bob Hull and Ralph Smith, referred to in Mr. Leasure's letter dated September 17, 1976, which occurred a few days before the date of letter, neither the United States Forest Service nor any other federal agency had ever notified Soda Flat Company or its predecessors, either in writing or orally, of the asserted claim of the United States Government to the real property.

The parties stipulated that in 1970 the Forest Service sent a form to the plaintiff with reference to the possibility of engaging in an exchange with the National Forest. That letter was promptly answered on April 15, 1970. The Forest Service apparently did periodic fire inspections on the property between 1976 and 1977 according to the stipulated Exhibits.

## JURISDICTION

In *Block v. North Dakota,* 461 U.S. 273, 103 S.Ct. 1811, 75 L.Ed.2d 840 (1983), the Supreme Court decided that 28 U.S.C. § 2409a was the exclusive means by which adverse claimants could challenge the United States' title to real property, and its passage constituted a waiver of immunity to claimants making that assertion.

## ANALYSIS

1. *Effect of Disclaimer*

■ The Government argues that prior to the enactment of the 1922 Act, the General Land Office was without authority to reconvey the subject land. The characterization of the General Land Office's practices in issuing the disclaimer as "unauthorized" is imprecise. Although not authorized by statute, the practice of the General Land Office was certainly acquiesed in by the Secretary of the Interior and later codified by Congress in the 1897 Act. In providing a subsequent statutory sanction, Congress evidently found nothing objectionable in the practice.

The Government's argument that the actions of the General Land Office were un-

authorized is simply predicated on the fact that Congress provided *post hoc* statutory authority for a practice of which the Secretary of the Interior and the Public Land Commissioner were certainly aware and at least tacitly approved.

*United States v. Sears, Roebuck & Co.*, 778 F.2d 810 (D.C.Cir.1985), provides a useful framework within which to analyze the instant facts. In *Sears*, the General Counsel of the Secretary of Commerce entered into an agreement with Sears regarding anti-dumping duties assessed against importers and manufacturers of Japanese television receivers. *Id.* at 811. The Government sought to avoid the agreement arguing that only the Secretary could bind the Government relying on 19 U.S.C. § 1617. *Id.* at 813. The D.C. Circuit rested its decision binding the Government to honor the agreement on two aspects of the case. First, the *Sears* panel explained that " '[w]hile the Secretary indeed holds authority to compromise claims for antidumping duties, the Secretary has delegated to the Department's General Counsel, *inter alia*, authority to take any actions necessary to implement any decision by [the Secretary] on the compromise of claims ... including the signing and execution of any settlement documents and making any correction or changes that may be necessary therein. [citations]' " *Id.* at 813.

In rejecting as implausible and irrational, the Government's argument that each settlement had to be approved by the Secretary, the *Sears* panel noted that under the relevant statutory scheme the Secretary made the overall policy decisions on settlement and left the finer details up to the General Counsel. *Id.* at 814.

Second, the D.C. Circuit emphasized that Sears was not dealing with petty officers or middle-range functionaries but the agent given the authority to negotiate the specific details of individuals agreements. *Id.*

Similarly, in the instant case, the Secretary of the Interior was given the broad, overall authority to effectuate the exchange of privately owned lands with the national forest. In turn, the Secretary delegated the authority to negotiate the subject exchanges in specific cases to the General Land Office. Further, it appears that the Secretary was well aware and tacitly approved of the practice of the General Land Office in issuing disclaimers. The source of the distress that the Secretary expressed to Congress that the disclaimers were perhaps illegal is not identified. Perhaps some States did not recognize them. It is clear, however, that nothing has been brought to the Court's attention which might indicate that the practice was unlawful under any Federal law or regulation.

It is well settled that the Government is not bound by the *unauthorized* acts of its agents. *Heckler v. Community Services of Crawford County, Inc.*, 467 U.S. 51, 60, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42, 52 (1984). This case, however, does not involve actions which were unauthorized. On the contrary, the facts indicate that the actions reflected the approved administrative practice of the Secretary of Interior and/or the General Land Office. The instant case, accordingly, must be distinguished from cases where the Government agent acted in express contravention of statutory or administrative standards. *See e.g. Royal Indemnity Co. v. United States*, 313 U.S. 289, 294–95, 61 S.Ct. 995, 997, 85 L.Ed. 1361, 1366 (1941) (local tax collector not authorized to reduce tax deficiency as power for such compromise only granted to Commissioner of the Internal Revenue Service upon consent of the Secretary of Treasury); *Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380, 383–86, 68 S.Ct. 1, 2–4, 92 L.Ed. 10, 14–16 (1947) (Government not bound by statement of local agent that crops were insurable when statement was in conflict with explicit Federal regulations); *Heckler v. Community Services, supra*, 467 U.S. 51, 64, 104 S.Ct. 2218, 2226, 81 L.Ed.2d 42, 54–56 (1984) (Government not bound by misrepresentations regarding published Federal regulations by "fiscal intermediary" under Medicare program).

In the instant case, the Government has not pointed to any statute or administrative regulations under which the actions of the General Land Office in issuing disclaimers

could be held unauthorized. Rather, the Government contends that the absence of any statutory or formal administrative sanction renders the practice unlawful. As the Supreme Court has recognized, Congress cannot possibly anticipate the multitudinous details concerning the implementation of a complex Federal program and must inevitably rely on the agency acting for the Government to carry out its policy under specific standards and guidelines. *Federal Crop Insurance v. Merrill, supra,* 332 U.S. at 384, 68 S.Ct. at 3, 92 L.Ed at 15. Accordingly, Congress relies on the rule making power of federal regulatory and administrative agencies to carry out its will. *Id.*

In the instant case, it is not clear whether the practice of issuing disclaimers was explictly instituted or directed by the Secretary of the Interior. It does appear, however, that the practice was routine and formalized. Further, the Government has not produced any evidence that the Secretary ever disapproved, disclaimed or disavowed the practice or the authority of the General Land Office to issue the disclaimers. On the contrary, the Secretary apparently believed, and so represented to Congress, that the on-going practice of the General Land Office was an acceptable procedure and Congress subsequently gave the practice its legislative sanction.

Further, it is important to note that the practice in question was not engaged in by some "petty officer or middlelevel functionary." The practice appears to have been developed in Washington D.C. by the General Land Office. Additionally, the Secretary was fully aware of the practice without ever taking any action to disapprove the practice.

### 2. *Statute of Limitations*

The Government contends this case is governed by *Gendron v. United States,* 402 F.Supp. 46 (E.D.Cal.1974)

In *Gendron v. United States, supra,* the court held:

> The plaintiff's action is barred by 28 U.S.C. 2409a(f) because it was not commenced within 12 years of the date upon which it accrued. Plaintiff's asserted predecessor in interest, C.B. Willingham, knew or should have known of the claim of the United States on June 9, 1899, when he conveyed the land in question in this quiet title action to the United States. At the very least, plaintiff's predecessors should have asserted their rights under the Acts of September 22, 1922 (16 U.S.C. § 483) and April 28, 1930 (43 U.S.C. § 872) to request a reconveyance of the land in question. Finally, the passage of Public Law 86–596, July 6, 1960, provided the plaintiff's predecessors with a last chance to assert their claims. Thus, the latest possible date at which the plaintiff's predecessor should have known of the claim of the United States to an interest in the subject land was July 6, 1961 (the cut-off date for payment of claim under Public Law 86–596), over 12 years and one month before this suit was filed. The requirements of a Statute of Limitations such as this are jurisdictional; the action must be dismissed.

The *Gendron* case was affirmed in a short *per curiam* opinion by the Ninth Circuit at 524 F.2d 1154 (9th Cir.1975).

The principal factual difference between the *Gendron* case and the instant case is, of course, the letter of disclaimer which was originally recorded in 1919 by the then fee claimant. Another substantial factual difference is the action of the parties with regard to the ownership of this land, i.e., the maps and records of the government, which so far are disclosed in this action, never indicated that the United States claimed any interest.

In *Park County Montana v. United States,* 626 F.2d 718 (9th Cir.1980), the County, in 1976, brought a quiet title action pursuant to 28 U.S.C. § 2409a to quiet title to an easement across certain lands located within the boundaries of the Gallatin National Forest. The National Forest in question was established in 1902. In 1962 the Forest Service placed a sign at the intersection of Slough Creek and Forest Service Trail 104. The plaintiff claimed a right-of-way in excess of that contained behind the

sign. The District Court rejected this contention as did the Circuit Court, noting that the sign should have put the County plaintiffs on notice as to the extent of the government's claim. In the instant case, however, we have no such claim of interest by the government in excess of the twelve (12) years from the filing date of the Complaint, i.e., October 25, 1985.

In *State of California v. Yuba Goldfields, Inc.,* 752 F.2d 393 (9th Cir.1985), it appeared that agencies of the United States and the State of California joined forces in acquiring property and for construction of restraining barriers and a settling basin along the Yuba River to forstall the flow of debris originating from Placer Mining down stream. Although the State of California contributed one-half of the acquisition costs of the subject property, all of the deeds ran to the United States as the sole grantee, and were recorded at various times between 1901 and 1906. The District Court held that the existence of the quit claim deeds running to the United States were reasonable notice in and of themselves of the government's claim. That the twelve (12) year period of the statute of limitations started to run from that period.

The facts of this case are similar to *Amoco Production Co. v. United States,* 619 F.2d 1383 (10th Cir.1980). In *Amoco,* the Federal Farm Mortgage Corporation, in 1942, conveyed a fee simple interest in certain property. The original deed and all other copies other than the recorded version were no longer in existence at the time of trial. The parties disputed the exact contents of the 1942 deed. The appellants —the United States and those claiming through it—contended that the deed as drawn reserved to the Federal Farm Mortgage Corporation a one-half mineral interest in the property.

In 1957, the Federal Farm Mortgage Corporation conveyed a quit claim deed to the United States all of its mineral interests in various tracts of property including the property in question. The United States subsequently leased its mineral claim of one-half mineral interest to the other appellants in this case. The grantees of the

original recipients of the deed from the Federal Farm Mortgage Corporation are the plaintiffs here. In construing the language of 28 U.S.C. § 2409a(f) the District Court stated:

The operative words of the statute— "should have known"—import a test of reasonableness. Only if it was unreasonable for the Newton Company to have failed to discover the claim of the United States should the limitations provision of § 2409a(f) become operative. When, as here, the relevant state law is inconclusive and ambiguous on the effect of a stray deed, we are not convinced that, as a matter of federal law, a party should be considered so unreasonable in failing to have discovered the existence of a claim that he will be charged with constructive knowledge of that claim. The doctrine of constructive notice, which creates a fiction and deals with hypothetical facts, is a harsh doctrine which should be resorted to reluctantly and construed strictly. *See United States v. Suring State Bank,* 150 F.Supp. 60, 62 (E.D.Wis.1957); *Cody Finance Co. v. Leggett,* 116 F.Supp. 700, 706 (D.Wyo. 1953), *aff'd sub nom. Reconstruction Finance Corp. v. Cody Finance Co.,* 214 F.2d 695 (10th Cir.1954).

*Amoco Production Co., supra,* 619 F.2d at 1388.

■ Based upon the foregoing authorities and the facts as recited, the Court finds that the plaintiff had notice of the adverse claim of the government in 1976, well within the twelve (12) year statute.

3. *Legal Effect of the Letter of Disclaimer*

It should be noted that in Blacks Law Dictionary, Fifth Edition, the word "disclaimer" is defined as follows:

A repudiation, a renuciation of a claim or power vested in a person or which he had formerly alleged to be his. The refusal, or rejection of a state or right offered by a person. The disavow, denial, or renuciation of an interest, right, or property imputed to a person or alleged to be his.

Also the declaration, or the instrument, by which such disclaimer is published. Estates. The act by which a party refused to accept an estate which has been conveyed to him.

A leading commentator on abstract and title practice has described a disclaimer as follows:

Disclaimer is the repudiation or renunciation of a claim or power vested in a person or which he had formerly alleged to be his. The refusal, or rejection of an estate or right offered to a person. The disavowal, denial, or renunciation of an interest, right, or property imputed to a person or alleged to be his. Also the declaration, or the instrument, by which such disclaimer is published [Footnote].

OF ESTATE

The act by which a party refuses to accept an estate which has been conveyed to him. Thus, a trustee who releases to his fellow-trustees his estate, and relieves himself of the trust, is said to disclaim [Footnote].

A disclaimer may also be a renunciation or a denial by a tenant of his landlord's title, either by refusing to pay rent, denying any obligation to pay, or by setting up a title in himself or a third person, and this is a distinct ground of forfeiture of the lease or other tenancy, whether of land or title.

Flick, *Abstract and Title Practice* ¶ 77, p. 83 (1958).

■ Under California law, a validly executed and recorded disclaimer is the factual equivalent of a quit claim deed. *Federal Home Loan Bank v. Long Beach Federal Savings and Loan Ass'n,* 122 F.Supp. 401, 417 (S.D.Cal.1954); See *Federal Home Loan Bank of San Francicso v. Hall,* 225 F.2d 349, 375–76 (9th Cir.1955).

There is no question that a Government agent issued a disclaimer disavowing any ownership interest in the subject land and that the disclaimer was duly recorded in Tulare County.

CONCLUSION

The Court grants plaintiff's Motion for Summary Judgment. The Court denies defendants' Motion for Summary Judgment. Counsel for the plaintiff is directed to lodge Findings of Fact and Conclusions of Law and a judgment in conformity with this Memorandum Decision within twenty (20) days of the date of this order.

IT IS SO ORDERED.

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

The cross-motions for summary judgment of the plaintiff and the defendants came on regularly for hearing on May 11, 1987 before the Court, with James R. Parker, Jr. of Kuhs & Parker appearing as attorney for the plaintiff and Sandra K. Dunn, trial attorney, Land and Natural Resources Division of the United States Attorney's Office, Sacramento, appearing as attorney for the defendants. The Court having examined the Stipulation Re Agreed Facts, all the declarations and briefs submitted by the parties and having heard and considered the arguments of counsel, now makes the following Findings of Fact and Conclusions of Law:

FINDINGS OF FACT

The Court finds:

1. The real property which is the subject matter of this action is an 80–acre parcel of real property in Tulare County, California, more particularly described as the South Half of the Southeast Quarter of Section 36, Township 19 South, Range 33 East, M.D.B. & M., Tulare County, California, according to the official plat thereof (hereinafter the "Real Property"). The Real Property, and all of Section 36 of which the Real Property is a part, was granted by the United States to the State of California as "school lands" under the Act of March 3, 1853 (10 Stat. 244) upon approval of the official plat of such township by the Surveyor General on June 28, 1883. By Patent dated October 2, 1900 and recorded on October 12, 1900 in Volume U of Patents, Page 141, Tulare County Offi-

cial Records (Exhibit 1) [1], the State of California granted the Real Property to one C.E. Glover.

2. On December 1, 1900, C.E. Glover, pursuant to the Act of June 4, 1897 (30 Stat. 11, 36) and the Rules and Regulations promulgated by the Secretary of Interior (24 L.D. 589, 592–593 (1897) (Exhibit 2)), filed with the Registrar and Receiver, United States Land Office, Redding, California, Lieu Selection Application No. 3516, consisting of the Application (Exhibit 3), the Affidavit of John McKea that the land selected was non-mineral and agricultural in character (Exhibit 4), an abstract of title to the Real Property duly certified by the Tulare County Recorder, and a Relinquishment Deed to the Real Property in favor of the United States dated October 8, 1900 (Exhibit 5), which Glover had previously recorded on October 12, 1900 in Book 100 of Deeds, Page 395 of Tulare County Official Records, as required by the Secretary of Interior's Regulations (Exhibit 2).

3. Pursuant to the Regulations (Exhibit 2), the Registrar and Receiver at the Redding Office forwarded Glover's application to the Commissioner of the General Land Office in Washington D.C. for consideration. On January 2, 1902, the application was examined, the lands selected were found free from conflict and proper, except as to mineral status and publication, and the file was referred to Division "N." On January 6, 1902, Lieu Selection No. 3516 was examined, found free from mineral or other conflicts, and referred to Division P. On June 17, 1911, the Commissioner issued charges against Lieu Selection No. 3516, alleging that the application for the state patent to the Real Property was fraudulently made.

4. By decision dated November 10, 1915 (Exhibit 6), the Commissioner of the General Land Office rejected Lieu Selection Application No. 3516, refused to accept the Relinquishment Deed to the Real Property tendered by Glover, and cancelled Application No. 3516, on the grounds that "... the selector has no title to the lands offered as base for this selection...." W.S. Kingsbury, Surveyor General of the State of California, had received on August 2, 1911 a copy of the charges filed against Lieu Selection No. 3516 dated June 17, 1911. The State of California has never commenced any action or proceeding to set aside the Patent dated October 2, 1900 to C.E. Glover (Exhibit 1) or quiet title to the Real Property.

5. When requested, the Commissioner of the General Land Office, after rejecting a lieu selection application, issued a disclaimer to the base land, intending that such disclaimer be recorded in the local land records of the county in which the base land was located for the purpose of clearing any cloud upon title created by the prior recording of the relinquishment deed. The Commissioner of the General Land Office, when requested, also returned the relinquishment deed and abstract of title to the applicant. Examples of disclaimer letters and letters returning relinquishment deeds and abstracts are collectively attached hereto as Exhibits 11–1 through 11–18 and 11–19 through 11–33, respectively.

6. By Indenture dated July 11, 1919 and recorded on October 15, 1919 in Volume 278 of Deeds, Page 254, Tulare County Official Records (Exhibit 7), C.E. Glover conveyed the Real Property to The McCloud River Lumber Company. By letters dated February 7, 1919 (Exhibit 8) and May 2, 1919 (Exhibit 9), The McCloud River Lumber Company, through its attorneys, Marshall & Glavis, requested the Commissioner of the General Land Office to furnish them with a disclaimer by the Government to the Real Property. By letter dated May 10, 1919 (Exhibit 10), Clay Tallman, the Commissioner of the General Land Office, advised Marshall & Glavis, as attorneys for The McCloud River Lumber Company, that Selection No. 3516 had been cancelled on November 10, 1915, "... the United States by such cancellation refused

---

**1.** Exhibits 1 through 25 set forth in these Findings of Fact are the same as Exhibits 1 through 25 to the Stipulation Re Agreed Facts on file herein; such exhibits, incorporated herein by reference, are not reproduced here at length but are part of the record of the action and are contained in the file.

to accept title to said base lands and does not now claim any right, title or interest to the said lands above described." On July 15, 1919, the abstract of title submitted by Glover was returned to B.W. Marshall, "... as attorney for C.E. Glover and the McCloud Lumber Co."

7. The Commissioner's disclaimer letter dated May 10, 1919 covering the Real Property was recorded on October 15, 1919 in Volume 11 of Miscellaneous Records, Page 483, Tulare County Official Records (Exhibit 12) in connection with the sale of the Real Property by The McCloud River Lumber Company to Eugene L. Scott by Indenture dated August 2, 1919, also recorded on October 15, 1919 in Volume 278 of Deeds, Page 255, Tulare County Official Records (Exhibit 13).

8. Eugene L. Scott constructed a one-room log cabin on the Real Property and fenced a substantial part thereof. The Real Property, its cabin and fenced pasturage became known as "Scott's Camp." Annual real property taxes have been assessed upon the Real Property and its improvements by the County of Tulare and have been paid each year since at least 1919.

9. The chain of conveyances of the Real Property from Eugene L. Scott to the plaintiff Soda Flat Company consists of the following described instruments, copies of which are attached hereto as the following designated exhibits:

| Description of Document | Exhibit |
| --- | --- |
| (a) Indenture dated February 12, 1923 from Eugene L. Scott to Robert Horbach, recorded on February 26, 1923 in Volume 10, Page 60, Tulare County Official Records. | 14 |
| (b) Indenture dated May 1, 1923 from Robert Horbach in favor of Eugene L. Scott, recorded on April 10, 1924 in Volume 62, Page 237, Tulare County Official Records. | 15 |
| (c) Indenture dated May 1, 1923 from Eugene L. Scott and Dora Scott, his wife, to J.W. Hewey, recorded on April 10, 1924 in Volume 62, Page 238, Tulare County Official Records. | 16 |
| (d) Decree of Final Distribution in the Matter of the Estate of J.W. Hewey, Tulare County Superior Court Probate No. 6475, dated June 10, 1935, in favor of his widow Anna L. Hewey, recorded on June 10, 1935 in Volume 630, Page 216, Tulare County Official Records. | 17 |
| (e) Deed dated July 14, 1943 from Anna L. Hewey to Ralph L. Smith, Jr. and Edna M. Smith, his wife, Frank Digier and Alberta Digier, his wife, and Lloyd Ralphs and Edna Ralphs, his wife, recorded on August 7, 1943 in Volume 1040, Page 288, Tulare County Official Records. | 18 |
| (f) Grant Deed dated February 19, 1968 from Ralph L. Smith, Jr., Edna M. Smith, Frank Digier, Alberta Digier, Lloyd Ralphs and Edna Ralphs in favor of Soda Flat Company, a California corporation, recorded on March 4, 1968 in Volume 2767, Page 57, Tulare County Official Records. | 19 |

10. The Smiths, Digiers and Ralphs paid Anna Hewey $4,500 for the Real Property in 1943 and received a policy of title insurance in such amount from Title Insurance and Trust Company (Exhibit 20). The Smiths, Digiers and Ralphs at the time they acquired the Real Property had no knowledge of the charges made by the Commissioner against Lieu Selection No. 3516 in 1911. On October 31, 1967, Ralph and Edna Smith, Frank and Alberta Digier and Lloyd and Edna Ralphs incorporated Soda Flat Company, which remains a California corporation in good standing, and conveyed the Real Property to it in February 1968. The Smiths, Digiers and Ralphs from 1943 through 1967 paid real property taxes assessed upon the Real Property, its cabin and other improvements by the County of Tulare; Soda Flat Company has paid real property taxes assessed on the Real Property, its cabin and other improvements from 1968 through the current year. The Smiths, Ralphs and Digiers, and their families have used, occupied, maintained and improved the Real Property, its cabin, fences and other improvements from 1943 to the present. Photographs of the cabin, cookshed, bathhouse and other improvements are attached collectively hereto as Exhibit 21. Soda Flat Company and the County of Tulare by Land Conservation Contract dated January 16, 1973 (Exhibit 22) placed the Real Property into the agricultural preserve pursuant to the Williamson Act. Ralph and Edna Smith and Frank and Alberta Digier are now deceased but the stock of Soda Flat Company remains held by their children and by Lloyd and Edna Ralphs.

11. When Glover filed Lieu Selection Application No. 3516 in 1900, the Real Property was surrounded by the Sierra Forest Preserve, later organized into the Inyo and Sequoia National Forests. Although technically within the exterior boundaries of the Inyo National Forest, the immediate area around the Real Property was administered by the Sequoia National Forest from 1968 through 1980. The Real Property was shown as private property, not National Forest lands, on the following official maps of the United States Forest Service, which maps were published for and made available to the general public:

(a) INYO NATIONAL FOREST
(SOUTH HALF)
California and Nevada
Mt. Diablo Meridian
1949

(b) INYO NATIONAL FOREST
(SOUTH HALF)
California and Nevada
Mt. Diablo Meridian
1964

(c) MAP
Showing
Motor Vehicle Control Area
Sequoia & Inyo National Forest
U.S. Department of Agriculture—
Forest Service
1975

(d) U.S. Department of Agriculture
Forest Service
R. Max Peterson, Chief
SEQUOIA & INYO NATIONAL FOREST
Mt. Diablo Merdian
1978

As of June 3, 1971, the land records of the Sequoia National Forest, which administered Inyo National Forest lands south of the Kern Ridge-Toowa Range from the Kern River to Olancha Peak, including the area around the Real Property, indicated that the Real Property was in private ownership, not Forest Service lands. The Real Property was shown as National Forest Lands, not private property, on the following official maps of the United States Forest Service, which maps were published for and made available to the general public:

(a) INYO NATIONAL FOREST
(SOUTH HALF)
California and Nevada
Mt. Diablo Meridian
1972

(b) Primary Base Series Map
HOCKETT PEAK N.E. CALIFORNIA
U.S. Department of the Interior
Geological Survey
Modified for USDA Forest Service Use
1977

(c) U.S. Department of Agriculture
Forest Service
John R. McGuire, Chief
Forest Visitor Map
INYO NATIONAL FOREST–CALIFORNIA
1979

(d) U.S. Department of Agriculture
Forest Service
R. Max Peterson, Chief
SEQUOIA NATIONAL FOREST–CALIFORNIA
1983

The United States has maintained for general public use Forest Service Trail No. 34C19 from the Kern River to Jordan Hot Springs which crosses through the Real Property. Except for this trail, the United States has never physically occupied, possessed or improved the Real Property. This trail has been maintained without a grant of easement by the plaintiffs or their predecessors in interest.

12. By letter dated September 17, 1976 mailed Ralph L. Smith (Exhibit 23), John A. Leasure, Sequoia National Forest Supervisor, asserted that the Real Property was "Federal lands." Mr. Leasure wrote, in part, as follows:

It was conveyed to the United States of America by C.E. Glover under the Act of June 4, 1897 ... C.E. Glover did not subsequently receive either a lieu selection or a reconveyance under either the said Act of June 4, 1897, the Act of

September 22, 1922 ..., or or the Act of April 28, 1930.... A claim to the land was not registered with the Department of Interior under the Script Recordation Act of August 5, 1955 ... during the two year period provided for registration. The Act of July 6, 1960 ..., confirmed title to the United States. The person claiming at that time failed to file claim for reimbursement under provisions of the 1960 Act within the one year allowed."

Except for a telephone conversation between the Forest Service's Bob Hull and Ralph Smith referred to in Mr. Leasure's letter dated September 17, 1976, which occurred a few days before the date of the letter, neither the United States Forest Service nor any other federal agency had ever notified Soda Flat Company, or its predecessors, either in writing or orally, of the asserted claim of the United States government to the Real Property. Previous correspondence between Soda Flat Company and the United States government was limited to a Forest Service form letter dated April 14, 1970 (Exhibit 24) inquiring as to the details of Soda Flat Company's acquisition of the Real Property from the Smiths, Digiers and Ralphs in 1968, Ralph L. Smith's reply thereto dated April 15, 1970 (Exhibit 25) and various annual fire inspection forms left at the cabin on the Real Property each year by Fire Prevention Technicians (Exhibit 26).

13. In reply to Mr. Leasure's letter, Ralph L. Smith, Jr. advised the Forest Service by letter dated September 30, 1976 (Exhibit 27), in part, as follows:

"My wife and I, together with four other persons, acquired this property in August of 1943 and occupied and paid taxes on such property until it was conveyed to Soda Flat Company in 1968. Since 1968, Soda Flat Company, 100% owned by the original six persons, has occupied and paid the taxes on such property. Insofar as we are aware, the United States has no valid claim to the property, and the Forest Service has no basis for attempting to administer such property as part of the Sequoia National Forest.

"I have asked Title Insurance and Trust Company to research this claim and explain to me how they gave me a title policy in 1943.

"We have long enjoyed an amicable relationship with the Forest Service, and we wish to do so in the future. Nevertheless, we cannot acquiesce to your assertion that our property is Federal lands."

14. On or about March 16, 1977, Soda Flat Company filed an application (Exhibit 28) with the California State Office of the Bureau of Land Management ("BLM") for a Document of Disclaimer pursuant to Section 315 of the Federal Land Policy and Management Act of 1976 (90 Stat. 2744; 43 U.S.C., § 1745).

15. On February 24, 1978, the President signed the Endangered American Wilderness Act of 1978 (92 Stat. 40) which designated about 306,000 acres in the Inyo and Sequoia National Forests as the "Golden Trout Wilderness Area" to be administered, subject to valid existing rights, pursuant to the Wilderness Act (78 Stat. 890; 16 U.S.C., § 1131). The Real Property is within the exterior boundaries of the Golden Trout Wilderness Area.

16. By letter dated July 23, 1981 (Exhibit 29), the California State Office of the BLM advised the Forest Service of Soda Flat Company's filing of an application for a recordable disclaimer and stated additionally:

"Submitted with the application was a copy of a letter dated May 10, 1919, from the Commissioner of the General Land Office which states in part as follows:

'... In reply you are advised that as the selection was canceled November 10, 1915, the United States by such cancellation refused to accept title to said base lands (S½SE¼ Sec. 36, T. 19 S., R. 33 E., MDM.,) and does not now claim any right, title or interest to the said lands above described.'

Since the Department of Interior has disclaimed any interest in the above-described land, we propose to record the November 10, 1915 letter, thereby clearing the title to the same. Before taking

such action, we would appreciate any comments you have to our recommended action."

The Forest Service's reply dated December 28, 1981 (Exhibit 30) urged BLM not to record the Commissioner's disclaimer (Exhibit 10):

"We strongly recommend that the November 10, 1915 [sic May 10, 1919], letter *not* be recorded. Since letter disclaimers were not authorized prior to September 22, 1922, and are not considered reconveyances 'as provided by law,' the instrument would not divest the United States of any interest in the land. However, recordation of the disclaimer would impart constructive notice of its existence and the United States could conceivably be estopped from asserting title to the land."

By Instruction Memorandum dated November 18, 1982 (Exhibit 31), the Acting Associate Director of the BLM instructed all State Directors to deny all pending applications for recordable disclaimers to "former lieu selection base lands within the National Forests."

17. By letter dated September 30, 1982 (Exhibit 32), Soda Flat Company requested BLM to consider its application to be also filed pursuant to the authority of Section 6 of the Act of April 28, 1930 (46 Stat. 857; 43 U.S.C. § 872). By Decision dated December 7, 1982 (Exhibit 33), the California State Office of the Bureau of Land Management rejected Soda Flat Company's application. Soda Flat Company timely filed a Notice of Appeal (Exhibit 34) of the California State Office's Decision to the Interior Board of Land Appeals and a Statement of Reasons and Request for Hearing (Exhibit 35). By Decision dated September 2, 1983 (Exhibit 36), the Interior Board of Land Appeals upheld the decision of BLM's California State Office. The instant case was commenced in this court on October 24, 1985.

18. Neither the plaintiff nor the plaintiff's predecessors in ownership of the Real Property knew or should have known of the United States' claim to the Real Property before the telephone conversation between the Forest Service's Bob Hull and the plaintiff's Ralph Smith which occurred a few days before the letter dated September 17, 1976 from John A. Leasure, Sequoia National Supervisor, to Ralph L. Smith (Exhibit 23) was mailed.

19. The Commissioner of the General Land Office had the authority to either accept or reject relinquishment deeds to base lands tendered to the United States pursuant to the exchange provisions of the Act of June 4, 1897 (30 Stat. 11, 36).

20. The General Land Office instituted the practice of issuing letters of disclaimer so that landowners whose applications were rejected could clear whatever cloud was created on their title by virtue of the execution and/or recordation of the quitclaim deed given to the Government.

21. The Secretary of Interior was aware of and tacitly approved the General Land Office's practice of issuing disclaimer letters to rejected base lands.

22. After the recording of the disclaimer letter dated May 10, 1919 (Exhibits 10 and 12) in Tulare County Official Records, all parties have treated the Real Property as being privately owned; the Forest Service has never "administered" the Real Property, as claimed in the Forest Service's September 17, 1976 letter. The land records of the Sequoia National Forest indicated that the real property in question was in private ownership.

## CONCLUSIONS OF LAW

■ 1. This Court has jurisdiction of the plaintiff's action to quiet its title to the Real Property against the claims of the United States pursuant to 28 U.S.C. § 2409a et seq.

2. The plaintiff's action to quiet title was timely commenced within the 12–year statute of limitations in 28 U.S.C., § 2409a(g).

■ 3. The law does not force a man to take title to real property against his will; a deed does not transfer title unless it is accepted by the grantee. Similarly, the exchange provisions of the Act of June 4, 1897 (30 Stat. 11, 36) did not require the

General Land Office to accept relinquishment deeds to base lands whose titles the General Land Office believed were imperfect. The General Land Office quite properly did not want to transfer lands in which the United States had perfect title in exchange for lands with clouded or imperfect title.

 4. While the recordation by Glover of the Relinquishment Deed in Tulare County created under California law a presumption that prima facie title had passed to the United States, such presumption was rebutted by the rejection of such deed by the Commissioner of the General Land Office in 1915 and the 1919 disclaimer by the United States of any interest in the Real Property.

5. The claims of the United States to the Real Property, based on Glover's relinquishment deed and the so-called Sisk Act (74 Stat. 334) are invalid because the United States refused to accept title in 1915 and formally disclaimed any interest in the Real Property in 1919.

6. In rejecting Glover's Relinquishment Deed and disclaiming any interest in the Real Property as aforesaid, Clay Tallman was acting within the scope of his authority as Commissioner of the General Land Office of the United States of America and in accordance with law.

7. Under California law, a validly executed and recorded disclaimer is equivalent to a quitclaim deed; Commissioner Tallman's disclaimer letter (Exhibits 10 and 12) was validly executed and recorded in Tulare County Official Records, the effect of which was to remove any possible cloud upon title created by Glover's recording of the Relinquishment Deed.

8. The plaintiff owns the Real Property in fee simple and the United States has no estate, right, title or interest therein or any right of possession therein, save and except for an easement to maintain Forest Service Trail No. 34E19 from the Kern River to Jordan Hot Springs over the present alignment across the Real Property.

9. Judgment should be entered quieting title in the plaintiff as aforesaid against the United States, and all departments, instrumentalities and agents thereof, and the individual defendants should be dismissed.